DOBOS, Appellant,

v.

DOBOS, Appellee.

[Cite as *Dobos v. Dobos*, 179 Ohio App.3d 173, 2008-Ohio-5665.]

Court of Appeals of Ohio,
Twelfth District, Clermont County.

No. CA2007–11–108.

Decided Nov. 3, 2008.

Legal Aid Society of Greater Cincinnati, and David C. Cramer, for appellant.
T. Martin Jennings, for appellee.

YOUNG, Judge.

{¶ 1} Petitioner-appellant, Jennifer Dobos, appeals the decision of the Clermont County Court of Common Pleas, Division of Domestic Relations, denying her petition for a Civil Protection Order ("CPO") against her husband, Sandor Dobos, a citizen of Hungary, for lack of jurisdiction. For the following reasons, the decision of the domestic court is reversed and the case is remanded for further proceedings.

{¶ 2} Jennifer and Sandor were married in Hungary on September 25, 1999. Two children were born as issue of the marriage, one in Hungary and one in

Ohio. The Doboses moved from Hungary to Ohio in 2001 and remained there until April 2004, when they returned to Hungary.

{¶ 3} In May 2007, Jennifer returned to Ohio with her two children and subsequently filed a petition for a CPO. According to the petition, Sandor was physically and emotionally abusive towards Jennifer throughout the duration of their marriage, both in Ohio and Hungary.

{¶ 4} As alleged in her proposed findings of fact (filed with the court after her request for a permanent CPO was denied), while living in Ohio, Sandor would push Jennifer onto the floor when he was dissatisfied with the cleanliness of the home or if meals were not cooked to his satisfaction. Sandor also grabbed Jennifer violently on multiple occasions and threatened her with physical harm or abandonment. Sandor also continually threatened suicide and behaved irrationally on multiple occasions. The abuse and irrational behavior continued through the course of their marriage and after they returned to Hungary.

{¶ 5} In her petition for the CPO, Jennifer described an incident in Hungary where Sandor ran naked into the streets after Jennifer fled the house to avoid another beating. Sandor caught her, dragged her back into the house by her hair and severely beat Jennifer, hitting her over 50 times in the face, head, and body. This incident and countless acts of abuse occurred in front of the couple's children.

{¶ 6} After seeking medical attention to treat her bruised body, swollen face, and battered legs, Jennifer sought protection through Hungarian officials. However, because she could not produce proof of broken bones or puncture wounds, she was turned away because abuse absent such injuries is not considered against Hungarian law. At that point, Jennifer returned to Sandor and the marital home in Hungary long enough to procure the needed passports and plane tickets to return to Ohio.

{¶ 7} Once in Ohio, Jennifer filed for the CPO, stating that she was fearful for herself and the safety of her children. Jennifer also alleged that since her return, Sandor has attempted to locate her and the children, often threatening to force Jennifer and the children to return to Hungary. Upon moving the court for protection, the magistrate held an ex parte hearing and granted a temporary CPO. The magistrate also set a full hearing on the petition and Sandor entered a limited appearance through counsel in order to object to the jurisdiction of the Clermont County Domestic Relations Court.

{¶ 8} Both parties filed briefs, and the magistrate heard oral arguments on the jurisdiction issue but did not hold an evidentiary hearing as to the facts related to jurisdiction or the domestic violence. After the oral arguments, the magistrate dismissed the CPO petition for lack of personal jurisdiction. The decision was

later signed by the trial court, making the decision a final, appealable order. Jennifer subsequently filed a request for findings of facts and conclusions of law and submitted her proposed findings and conclusions to the court. Jennifer now appeals the decision of the trial court, raising two assignments of error.

{¶ 9} Assignment of Error No. 1:

{¶ 10} "The trial court erred in dismissing the petition for a civil protection order for lack of personal and subject matter jurisdiction."

{¶ 11} In her first assignment of error, Jennifer argues that the trial court erred by dismissing her CPO because Ohio has jurisdiction over Sandor and may properly hear the dispute. In the alternative, Jennifer argues that the trial court erred by not holding an evidentiary hearing in order to establish what contacts the threatening phone calls created and to what degree Jennifer suffered domestic violence while she lived in Ohio. The argument regarding the need for an evidentiary hearing is meritorious.

{¶ 12} While a review of a trial court's decision regarding a civil protection order requires an abuse-of-discretion standard of review, *Ashburn v. Roth,* Butler App. Nos. CA2006–03–054, CA2006–03–070, 2007-Ohio-2995, 2007 WL 1731426, a determination of jurisdiction is reviewed de novo. *Buflod v. Von Wilhendorf, L.L.C.,* Warren App. No. CA2006–02–022, 2007-Ohio-347, 2007 WL 210790. Before a trial court may exert personal jurisdiction over a nonresident defendant, it must complete a two-step analysis.[1] *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.* (1990), 53 Ohio St.3d 73, 559 N.E.2d 477. First, the defendant must satisfy the provisions of Ohio's long-arm statute, R.C. 2307.382, and second, exercising jurisdiction over the defendant must comply with due-process requirements inherent in the Fourteenth Amendment. Id.

{¶ 13} "The due process clause protects an individual's liberty interest in not being subject to binding judgments of a forum with which that individual has established no meaningful contacts, ties, or relations." *Multiform Plastics Inc. v. Thermo Plastics Display, Inc.* (July 12, 1993), Clermont App. No. CA93–01–004, 1993 WL 257232, *1, citing *Burger King Corp. v. Rudzewicz* (1985), 471 U.S. 462, 471, 105 S.Ct. 2174, 85 L.Ed.2d 528. An Ohio court can assert jurisdiction if the nonresident defendant has certain minimum contacts with Ohio so that having him defend in Ohio does not offend traditional notions of fair play and substantial justice. *Internatl. Shoe Co. v. Washington* (1945), 326 U.S. 310,

---

1. Subject-matter jurisdiction is conferred by statute. R.C. 3113.31(B) states that "[t]he court has jurisdiction over all proceedings under this section." R.C. 3113.31(A)(2) defines "court" as the "domestic relations division of the court of common pleas in counties that have a domestic relations division."

66 S.Ct. 154, 90 L.Ed. 95. "The constitutional touchstone is whether the nonresident defendant purposely established contacts in Ohio so that the defendant should reasonably anticipate being haled into court there." *VanCamp v. VanCamp* (Dec. 31, 2001), Butler App. Nos. CA2001–03–058, CA2001–03–059, CA2001–03–060, 2002 WL 4472, *4, citing *Burger King Corp.* The court in *Burger King* also went on to say that jurisdiction is proper if the contacts proximately result from the defendant's actions that create a substantial connection with the forum state.

{¶ 14} Once minimum contacts are established, a court may balance several factors to determine if exercising jurisdiction would offend fair play and substantial justice. Id. These factors include the burden on the defendant and the forum state's interest in adjudicating the dispute, as well as the plaintiff's interest in obtaining convenient and effective relief. *Columbus Show Case Co. v. CEE Contracting, Inc.* (1992), 75 Ohio App.3d 559, 599 N.E.2d 881, citing *Burger King Corp.* "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King Corp.*, 471 U.S. at 476–477, 105 S.Ct. 2174, 85 L.Ed.2d 528.

{¶ 15} In its decision dismissing for lack of jurisdiction, the magistrate stated that if believed, the facts included in Jennifer's petition for the original CPO constitute a prima facie case of domestic violence.[2] The magistrate then noted that Sandor is a citizen of Hungary, which is six time zones and approximately 6,000 miles away from Ohio. The magistrate went on to say that the acts of domestic violence alleged by Jennifer took place in Hungary and that she had since fled to Ohio. After citing *Internatl. Shoe*, the magistrate concluded that Sandor did not have minimum contacts with Ohio because he did not commit any acts of violence in Ohio and the fact that Jennifer fled to Ohio did not give the court jurisdiction over the matter.

{¶ 16} The magistrate also cited R.C. 3113.31(D)(1), which states that "[i]mmediate and present danger * * * constitutes good cause for purposes of this section." The magistrate then concluded that because Hungary was 6,000 miles away, there was no immediate and present danger in Ohio, and summarily dismissed Jennifer's petition.

{¶ 17} The magistrate did not analyze any other factors regarding jurisdiction as directed by the Supreme Court in *Burger King* and ignored case law in Ohio

---

**2.** We note that because the magistrate determined the jurisdictional matter without an evidentiary hearing, he was under an obligation to view Jennifer's allegations in the light most favorable to her. See *Giachetti v. Holmes* (1984), 14 Ohio App.3d 306, 14 OBR 371, 471 N.E.2d 165.

that demonstrates that jurisdiction exists in cases with similar facts to the one at bar.

{¶ 18} First, regarding Ohio's long-arm statute, R.C. 2307.382 states that a court may exercise jurisdiction over a nonresident defendant if that defendant "(6) [c]aus[es] tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state; (7) [c]aus[es] tortious injury to any person by a criminal act, any element of which takes place in this state."

{¶ 19} As mentioned by the magistrate, R.C. 3113.31(D)(1) states that "[i]mmediate and present danger * * * constitutes good cause for purposes of this section."[3] However, the section to which R.C. 3113.31(D)(1) refers to ex parte orders that require a hearing the same day that the petition is filed. Regarding a full hearing to establish a permanent order, R.C. 3113.31 defines domestic violence as "the occurrence of one or more of the following acts against a family or household member: (a) attempting to cause or recklessly causing bodily injury; (b) placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 * * * of the Revised Code." However, the sections dealing with a full hearing do not require any other imminency element other than the threat of force needed to place another in fear of imminent harm.

{¶ 20} Because there was no evidentiary hearing or resulting findings of fact regarding the phone calls, the magistrate did not analyze how Sandor's threatening phone calls, or the possibility of him coming to Ohio, could reasonably place Jennifer and her children in fear of imminent physical harm. Further, R.C. 2903.211 deals with menacing by stalking and states that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."

{¶ 21} If Jennifer's assertions are substantiated through an evidentiary hearing, the long-arm statute would be fulfilled. As alleged, Sandor continually calls Ohio citizens, looking for Jennifer and the children, and threatens to come to Ohio to force her and the children back to Hungary. Both attorneys mentioned the phone calls during oral arguments, but the magistrate did not hold an evidentiary hearing specific to what the phone calls entailed. The magistrate never made

---

3. R.C. 3113.31(D)(1) goes on the say that "[i]mmediate and present danger includes, but is not limited to, situations in which the respondent has threatened the family or household member with bodily harm * * * or in which the respondent previously has been convicted of or pleaded guilty to an offense that constitutes domestic violence against the family or household member."

any findings as to what degree the calls constituted menacing or in what way they would place Jennifer or her children in imminent fear.

{¶ 22} Though Hungary is multiple time zones away, the magistrate could have considered Sandor's history of domestic violence to determine whether Jennifer's fear resulting from the phone calls and thought of Sandor coming to Ohio was reasonable. See *Conkle v. Wolfe* (1998), 131 Ohio App.3d 375, 722 N.E.2d 586 (affirming the grant of a CPO where the victim's fear was reasonable because appellant had a history of threatening to kill himself and harassing the victim over the phone and by mail); and *Eichenberger v. Eichenberger* (1992), 82 Ohio App.3d 809, 816, 613 N.E.2d 678 (affirming grant of a CPO when the victim's fear was reasonable and "could very well have been the product, in part at least, of her past interactions with appellant. The fear she claimed to have felt and the reasonableness of that fear could and should be determined with reference to her history with appellant").

{¶ 23} Upon remand, the evidence may substantiate that Jennifer has a reasonable fear based on the history she shares with Sandor. Jennifer alleges countless acts of abuse and many instances that supposedly took place in front of her children. Although the magistrate focused on the distance between Ohio and Hungary to dismiss the requisite fear of imminent harm, nothing indicates that Sandor would have any reason to inform Jennifer that he is on his way to the United States. Instead, Sandor could show up at any time, and Jennifer would have no notice of his presence in Ohio. Sandor has access to Ohio from multiple daily flights and is under no obligation to announce his arrival. Based on the history of their relationship and the possibility of incurring additional harm at Sandor's hands, an evidentiary hearing would speak to whether Jennifer's fear of imminent physical harm is reasonable.

{¶ 24} If the hearing establishes that Sandor caused either tortious injury, or in the alternative, an element of domestic violence, Sandor's actions will have invoked the long-arm statute, and the jurisdiction analysis would turn to the second part of the test.

{¶ 25} Secondly, an evidentiary hearing would establish if exercising personal jurisdiction over Sandor would violate due process. While the magistrate cited *Internatl. Shoe,* that case's progeny and specific application in Ohio bears weight on this case.

{¶ 26} Regarding minimum contacts, Ohio courts recognize that when a nonresident has lived in Ohio for an extended amount of time, he is likely to have established contacts with the state. See *In Re Holbert* (Sept. 11, 1997), Franklin App. No. 97APF04–478, 1997 WL 566191 (affirming the exercise of jurisdiction when appellant lived in Ohio from October 1994 until November 1995 because by doing so, the appellant established minimum contacts with the state); but see

*Keller v. Keller*, Erie App. No. E–05–006, 2005-Ohio-5258, 2005 WL 2416022 (affirming dismissal of divorce for want of jurisdiction over appellant because couple had lived in Ohio for only three weeks, over 20 years ago).

{¶ 27} The undisputed facts establish that the Doboses lived in Ohio from 2001 and remained here until April 2004. During that time, Sandor worked and carried on his life here, establishing contacts with the state and availing himself to Ohio. The hearing would offer Sandor an opportunity to prove that the contacts he has established with this state by living here have been eviscerated by some means. Or, the court could determine that Sandor has added to these contacts and avails himself to Ohio by deliberately trying to find his wife and children, thereby engaging in activities directed towards this state.

{¶ 28} This distinction becomes important in an age where electronic communication eliminates the need for a defendant to physically appear in the state before establishing personal jurisdiction over him. Specifically, Ohio courts have found that purposeful availment exists when the nonresident uses the phone or email to establish minimum contacts. See *Pharmed Corp. v. Biologics, Inc.* (1994), 97 Ohio App.3d 477, 646 N.E.2d 1167 (reversing trial court's dismissal for lack of personal jurisdiction where appellee conducted significant activities within Ohio by negotiating with an Ohio-based corporation by telephone, fax, and mail).

{¶ 29} The Sixth District Court of Appeals has recently decided a case that seemingly has a similar posture to the case at bar. In *Haas v. Semrad*, Lucas App. No. L–06–1294, 2007-Ohio-2828, 2007 WL 1653032, the appellant made threatening phone calls from Florida, where he was a resident. In issuing the CPO, the magistrate concluded that appellant's threat of violence through the phone calls, combined with past acts of domestic violence, constituted the competent evidence necessary to grant the order. The magistrate also noted that appellant made several trips to Ohio in the past and concluded that it had jurisdiction over the appellant.

{¶ 30} In upholding the order, the appellate court reasoned that the threatening telephone call, as well as a history of violent acts, was sufficient to establish that appellant should have expected that the appellee would have been threatened and that the call was an adequate contact directed to Ohio that placed the appellee in fear of harm. Id. at ¶ 18. The court also noted that other states have exercised personal jurisdiction over a nonresident when the defendant's only contact with the petitioner is threatening phone calls or letters. See *McNair v. McNair* (2004), 151 N.H. 343, 856 A.2d 5; *Brown v. Bumb* (La.App.2004), 871 So.2d 1201.

{¶ 31} As we have already mentioned above, the Sixth District also considered the technological advances that make physical presence in a state unnecessary for minimum-contact purposes. "A defendant's physical presence in the forum state

is unnecessary when, in modern life, a substantial amount of interactions occur via telephone and electronic communications. 'So long as [an act is] "purposely directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.' " Id. at ¶ 18, citing *Ricker v. Fraza/Forklifts of Detroit,* 160 Ohio App.3d 634, 2005-Ohio-1945, 828 N.E.2d 205, ¶ 17.

{¶ 32} Most significantly, the court held that "appellee's petition arose out of appellant's purposeful action of telephoning appellee to threaten her; in order to contact appellee, appellant had to purposefully direct his communication into Ohio. As alleged in the petition, the threatening telephone call, when viewed in the context of [the] allegations of prior domestic violence in Ohio, was a threat of force which placed appellee in fear of harm. Therefore, in this context, the telephone call constitutes a sufficient minimum contact pursuant to *International Shoe.*" Id. at ¶ 20.

{¶ 33} An evidentiary hearing would clarify how similar the facts are to *Haas* and whether Sandor purposefully telephoned people in Ohio to threaten harm to Jennifer or the children. The threatening phone calls, considered in conjunction with the alleged prior domestic violence that occurred in both Ohio and Hungary, could be considered a threat of force that may place Jennifer in fear of harm.

{¶ 34} Additionally, the trial court needs to balance the *Burger King* factors as discussed above in order to determine whether exercising jurisdiction over Sandor comports with fair play and substantial justice. Here, Ohio's interest in adjudicating the dispute is palpable. Ohio law forbids domestic violence and also offers victims protection from further abuse through the implementation of CPOs. By instituting domestic-violence statutes and protective remedies, Ohio recognized that protecting its citizens from domestic violence is an important state interest. Jennifer also has an interest in obtaining convenient and effective relief, given that any relief she tried to obtain while in Hungary was futile. In Hungary, the police refused to help Jennifer because she could not produce evidence of a puncture wound or a broken bone. Ohio courts could offer Jennifer the protection she was otherwise denied in Hungary. These interests would need to be weighed against Sandor's burden of having to defend in Ohio. Sandor already has obtained Ohio counsel and has faxed documents to the court from Hungary, and nothing in the record indicates that Sandor would be unable to defend should the court exercise jurisdiction over him regarding a permanent CPO. However, an evidentiary hearing would provide Sandor the opportunity to demonstrate why having him defend in Ohio would be a burden to outweigh the significant state interests.

{¶ 35} Having determined that an evidentiary hearing and balancing test is necessary before determining jurisdiction, Jennifer's first assignment of error is sustained in part.

{¶ 36} Assignment of Error No. 2:

{¶ 37} "Alternatively, upon determining that it lacked personal jurisdiction over the respondent, the trial court erred by dismissing the action without a full hearing to consider granting prohibitory relief only."

{¶ 38} Jennifer's second assignment of error moves the court, in the alternative to jurisdiction, to issue orders for prohibitory relief. This assignment is moot given the fact that we have reversed the decision and remanded for further proceedings. We therefore withhold addressing the merits of prohibitory relief pending the evidentiary hearing to determine jurisdictional issues.

{¶ 39} The judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

WALSH, P.J. and POWELL, J., concur.