24CA1674 LS v Prospect Recreation 07-24-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0803
Jefferson County District Court No. 22CV30158
Honorable Diego G. Hunt, Judge

---

L.S., a Minor, by and through his parents and next friends, Tammy and Frank Straton, Tammy Stratton, and Frank Stratton,

Plaintiffs-Appellees,

v.

Prospect Recreation and Park District,

Defendant-Appellant.

---

ORDER AFFIRMED

Division V
Opinion by JUDGE JOHNSON
Welling and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 24, 2025

---

Parker Lipman, LLC, Christopher P. Koupal, Karen H. Blau, Denver, Colorado, for Plaintiffs-Appellees

The Lane Law Firm, P.C., Sean J. Lane, Brittney M. Townsley, Aurora, Colorado, for Defendant-Appellant

¶ 1     Defendant Prospect Recreation and Park District (Prospect) appeals the district court's order denying its motion to dismiss the claims asserted against it by plaintiff, L.S. (the child), whose parents and next friends, Tammy and Frank Stratton, brought the action on the child's behalf, alleging that the child was injured in an area maintained by Prospect.[1]

¶ 2     Prospect contends that the district court erred by finding that it waived immunity under the Colorado Governmental Immunity Act (CGIA) because (1) the horse pathway where the incident occurred (also referred to as the horse alley) was not a public facility; (2) the empty fencepost hole that allegedly caused the child to trip was not a public facility located in any park or recreation area; and (3) Prospect did not have actual or constructive knowledge of the dangerous condition.  As a result, Prospect asserts that the district court erred by failing to dismiss the child's claims against Prospect pursuant to the CGIA.  We disagree and, therefore, affirm the order.

---

[1] Richard Sherrill is also a named defendant in the case but he is not a party to this appeal.

## I.     Background

¶ 3     Prospect is a governmental entity.  On behalf of Jefferson County, Prospect owns and maintains Prospect Arena, a public park located in Arvada.  Prospect Arena is a rectangular parcel of land that runs north to south.  It contains a horse arena on the south end and a playground and covered pavilion on the north end. The park also has a horse pathway that is approximately ten feet wide and runs in an upside-down "L" shape along the northern and eastern edges of the park.  The horse pathway allows riders to access the horse arena from the northern end of the park.



Figure 1: Map of Prospect Arena

The rectangular image depicts Prospect Arena. The playground and pavilion are located toward the top of the image. The playground is a square parcel with an additional square jutting out on the upper lefthand corner. The pavilion can be identified by the blue square roof directly to the right and in line with the southern edge of the playground. The horse arena is located two-thirds down from the top and is a large dirt tract. The northern edge of the horse arena forms a roughly semicircular shape before it runs in straight lines north and south. The horse pathway runs along the top and down the right edge of the diagram. The fence line runs between the horse pathway and playground and pavilion. The image depicts the fence line before sections of the fence were removed.

3

¶ 4     Historically, a fence running along the inner edge of the horse pathway separated riders from the playground and pavilion.  But in September or October 2020, Prospect's employees removed a large section of the fence running from west to east and north to south on the northeastern edge of the park near the pavilion.  The fence was deteriorating, causing a safety hazard.  To remove the fence, Prospect employees wrapped a chain around the fenceposts and pulled them straight out of the ground with a small front end loader.  Prospect employees testified they filled in the fencepost holes with dirt after removing them.

¶ 5     In November 2020, the child was playing at the playground in Prospect Arena.  The child noticed two horse riders, Richard Sherrill (Sherrill) and another person, heading north on the horse pathway away from the horse arena.  As the child got closer, he tripped in what the district court determined was a half-empty fencepost hole, which had been created by Prospect's employees when they removed the fence in 2020.  As the child fell, he flailed his arms, scaring one of the horses.  The startled horse kicked sideways and struck the child in the head, causing the child to suffer a traumatic brain injury.

¶ 6　　The child's parents filed this lawsuit against Prospect and Sherrill asserting claims for negligence and premises liability. Prospect filed a motion to dismiss pursuant to the CGIA. The district court held a hearing in accordance with *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916 (Colo. 1993). Following the hearing, the district denied the motion to dismiss, determining that Prospect had waived immunity under the CGIA. Prospect now appeals. *See* § 24-10-108, C.R.S. 2024 (a court's decision on a motion raising sovereign immunity is a final order subject to an interlocutory appeal).

## II.　CGIA

¶ 7　　We first conclude that the district court correctly ruled that the horse pathway is a public facility. We then determine that the district court was correct by finding that the pathway and fencepost hole are located in a recreation area. Finally, we agree with the district court that the fencepost hole was a dangerous condition. As a result, we conclude the district court's order finding that Prospect waived sovereign immunity under the CGIA was proper.

5

### A. Standard of Review

¶ 8 "Governmental immunity implicates issues of subject matter jurisdiction that are determined in accordance with C.R.C.P. 12(b)(1)." *St. Vrain Valley Sch. Dist. RE-1J v. A.R.L.*, 2014 CO 33, ¶ 9 (*St. Vrain I*). "When the jurisdictional issue involves a factual dispute, a reviewing court employs the clearly erroneous standard of review . . . ." *Springer v. City & Cnty. of Denver*, 13 P.3d 794, 798 (Colo. 2000). A district court's conclusions are clearly erroneous if there is no support in the record. *Parocha v. Parocha*, 2018 CO 41, ¶ 11.

¶ 9 If disputed jurisdictional facts are inextricably intertwined with the merits, the plaintiff must prove a likelihood of success on the merits. *Jefferson County v. Dozier*, 2025 CO 36, ¶¶ 21, 24. This standard requires the district court to engage in "factfinding rather than merely making a ruling of law regarding sufficiency of the evidence to present a fact question." *Id.* at ¶ 21 (quoting *Foster-Miller, Inc. v. Babcock & Wilcock Can.*, 46 F.3d 138, 146 (1st Cir. 1995)).

¶ 10 If, however, "the facts are undisputed and the only issue is one of statutory interpretation, we review the district court's ruling de

novo." *Smokebrush Found. v. City of Colorado Springs*, 2018 CO 10, ¶ 17. "[O]ur primary task is to ascertain and give effect to the legislature's intent . . . ." *St. Vrain I*, ¶ 10. "To determine legislative intent, we construe the statute as a whole, giving consistent, harmonious, and sensible effect to all of its parts." *Smokebrush*, ¶ 18.

¶ 11     When "a statute is unambiguous, we give effect to the statute's plain and ordinary meaning and look no further." *Daniel v. City of Colorado Springs*, 2014 CO 34, ¶ 12. On the other hand, if the statute is ambiguous, we may employ other tools of statutory interpretation to determine legislative intent. *St. Vrain I*, ¶ 11.

## B.     Applicable Law

¶ 12     "[S]overeign immunity generally bars any action against a public entity for injuries that lie in tort or could lie in tort." *Smokebrush*, ¶ 20. The CGIA waives governmental immunity in "an action for injuries resulting from certain tortious governmental conduct, including certain kinds of negligent acts or omissions by public entities or their employees." *Id.* Because the CGIA derogates Colorado's common law, we strictly construe the CGIA's immunity provisions and broadly construe its waiver provisions. *Id.* at ¶ 22.

¶ 13    The CGIA provides that sovereign immunity "is waived by a public entity in an action for injuries resulting from . . . [a] *dangerous condition* of any . . . *public facility located in* any park or recreation area maintained by a public entity.  § 24-10-106(1)(e), C.R.S. 2024 (emphasis added).  Thus, under the CGIA, a plaintiff must prove that (1) "his . . . injury occurred in or on a 'public facility'"; (2) the public facility was "'located in' a 'recreation area'"; (3) the public facility was "maintained by" a public entity; and (4) a "'dangerous condition' existed and caused an injury in or on the public facility."  *Daniel*, ¶ 14.

### C.    The Horse Pathway is a Public Facility

¶ 14    It is undisputed that Prospect is a public entity and is responsible for maintaining Prospect Arena, including the horse pathway.  At issue, then, is whether the horse pathway is a "public facility" within a "recreation area" where a "dangerous condition" existed.

¶ 15    The district court concluded that while the fencepost hole, which was left when portions of the fence were removed, was not alone a "facility," "in conjunction with the other features of the park, [it] furthered the [facility's] purpose."  But Prospect argues

8

that the horse pathway is not part of a public facility of the playground, but is instead a separate facility that abuts the playground, as one does not ride horses on the playground or play on the horse pathway and arena. We reject this narrow view of "facility" because we — as the district court properly did — must look at the overall purpose of Prospect Arena, not just pieces of it in isolation.

¶ 16 Under the CGIA, a court conducts a two-step analysis to determine what constitutes a public facility. First, we examine whether the horse pathway is "public." *Id.* at ¶ 15. Second, we ask whether it is a "facility" for purposes of the CGIA. *Id.*

¶ 17 Turning to the first step, we conclude, like the district court, that the horse pathway is "public" because it is "accessible to and beneficial to the general public." *Id.* During the *Trinity* hearing, testimony of a Prospect employee, Sherrill, and the child's father established that Prospect Arena is open to the general public without the need for a permit. As a part of Prospect Arena, the horse pathway serves the public by providing users access to the horse arena from the north end of the park for recreational purposes. And Prospect Arena is maintained by Prospect for the

9

benefit of the public. *See St. Vrain I,* ¶ 28 ("We hold that for a facility to be 'public' under section 24–10–106(1)(e), it must be accessible to the public and maintained by a public entity to serve a beneficial public purpose.") (footnote omitted).

¶ 18 Second, although the court did not explicitly find the horse pathway was a facility, it found that the fencepost hole where the fence used to be, along with the playground, was part of the public facility comprised of the park as a whole. This is consistent with the supreme court's interpretation of the CGIA in *St. Vrain I.* In that case, the supreme court found the CGIA's use of the word "facility" to be ambiguous. *See id.* at ¶¶ 15, 23. But by employing the canons of statutory construction, the court concluded that the word does not encompass individual items, nor is it limited to buildings. Instead, it includes a "collection of items that serve a greater purpose." *Id.* at ¶ 24. The court in *St. Vrain I* ultimately concluded that an injury incurred by a child on a zip line on a public school playground occurred on a "facility" because the zip line was a component of a larger playground. *Id.* at ¶ 26.

¶ 19 Additionally, in *Daniel,* the supreme court concluded that a parking lot adjacent to a golf course was part of the recreation area

because it "promote[d] recreation by allowing golfers a convenient place to park after transporting themselves and their golf clubs to the golf course. While a vehicle is not absolutely necessary to play golf, a parking lot next to a golf course clearly promotes golfing." *Daniel*, ¶ 25.

¶ 20    Like the zip line and parking lot, the horse pathway next to the horse arena promotes recreation by allowing horse riders a pathway to and from the horse arena. It also promotes the safety of the recreation area by keeping horses in a designated lane and away from the children in the playground. Thus, the horse pathway serves as a fundamental component to the overall purpose of Prospect Arena. Prospect Arena's park design allows children and horses to recreate in proximity to one another.

¶ 21    But Prospect argues that the horse pathway is more akin to the walkway in *Young v. Brighton School District 27J*, 2014 CO 32. In *Young*, the supreme court was tasked with determining whether a concrete walkway that ran between a school playground and school building was a public facility under the CGIA. The supreme court determined that the walkway was not a public facility. *Id.* at

11

¶ 35.   While the walkway and horse pathway may appear similar at first blush, there are vital differences between the two.

¶ 22   The court in *Young* noted that the walkway "was not designed to promote a specific play activity" but "was designed for multiple purposes" other than recreation. *Id.* at ¶ 27.  While children utilized the walkway to access the playground, "the walkway also served as a way to access the school and a way to traverse the school grounds more generally." *Id.*  And the *Young* court distinguished the walkway from the parking lot in *Daniel*, which it said "was specifically designed for the purpose of providing visitors with a convenient place to park their vehicles while using the golf course's amenities." *Id.* at ¶ 26.  In *Young*, the court clarified that its holding should not be read to "imply that a walkway could *never* qualify as a component of a larger 'public facility.'" *Id.* at ¶ 30 n.11. Rather, it held that, "[i]f a *strong relationship* exists between the walkway and other recreational equipment such that together the walkway and equipment promote a broader, common purpose of recreation, such a walkway could so qualify." *Id.*

¶ 23   Contrary to the walkway in *Young*, the horse pathway serves the singular purpose of allowing horse riders to access from the

north side of the park the horse arena located in the south end of the park. *See id.* at ¶¶ 26-27 (contrasting the multiple uses of the walkway with the "singular purpose of the parking lot in *Daniel*"). The horse pathway is more analogous to the parking lot in *Daniel* because it was designed so that riders could conveniently access the horse arena from the northern end of the park.

¶ 24 And Prospect acknowledges that the horse pathway is "an *accessway* to recreation" for horse riders to get to and from the horse arena. (Emphasis added.) Prospect also concedes that the "[h]orse alley exists for the very purpose of separating horses and pedestrians, so horses and pedestrians do not share common spaces" and that the horse pathway is "meant only for travel by horse." But the horse pathway does not have different hours of operation from the playground, nor does it require an entrance fee or permit. In other words, while the playground and horse pathway serve different functions, their overall purpose is to promote recreation activities and safety for all users of the entire park. Thus, the horse pathway, along with the other components of Prospect Arena, promotes recreational opportunities for the public.

D.  The Horse Pathway is Located in a Recreation Area

¶ 25   The closer question is whether the horse pathway and the fencepost hole are "recreation areas." To determine this, we conduct a three-step analysis. First, we determine what property constitutes the relevant recreation area. *Daniel*, ¶ 24. "To do this, we include any contiguous areas of public property that plausibly promote recreation and exclude any areas that clearly do not promote recreation." *Id.* at ¶ 23. Second, if the recreation area was designed for both recreational and non-recreational purposes, we determine if the "'primary purpose' in constructing or maintaining the area was the promotion of recreation." *Id.* Third, if "the primary purpose was the promotion of recreation, we then determine whether the public facility at issue is 'located in' the boundaries of the recreation area." *Id.*

¶ 26   The court did not conduct a separate analysis to determine whether the fencepost hole was a "recreation area" once it determined Prospect Arena was a "public facility." Instead, because it impliedly considered the analyses to be similar, it used much of the same reasoning for both.

14

¶ 27    Prospect attempts to argue that the fencepost hole "was allegedly located at the nexus of two adjoining properties: Prospect Arena and the Van Bibber Trail [a residential path]."  It further argued that "the hole along the fence line that separated the two facilities could not plausibly be considered to promote recreation."

¶ 28    We can certainly contemplate instances where specific areas of a public facility would likely not be considered located within a "recreation area" because they encompass spaces within the public facility that does not primarily promote recreation.  But there was no signage noting that the fence or horse alley were off limits to certain users of the park.  Nor was the horse alley off limits to the playground users.

¶ 29    But because the fence had been removed before the child fell, identified in Figure 2 below, Prospect cannot rely on what the fence's intended purpose had been.  Rather, by the time the child ran toward the horses, there was no fence present at all.  Therefore, pedestrians could access the horse alley — and ostensibly horses could easily enter into the playground and pavilion area — without anyone knowing or even perceiving that Prospect Arena had intended for those two areas to be delineated with a fence.  Because

15

the area where the child fell and was injured had no barrier between the horse alley and playground, on this record, we cannot say that the horse path and playground, along with the land between those two areas, did not together primarily promote recreation.



Figure 2: Map of Prospect Arena After Fence Removal

The rectangular image depicts Prospect Arena after Prospect removed the fence. Portions of the fence along the top right corner of the image were removed and never replaced.

¶ 30    Finally, as to the third step, there is no dispute that the fencepost hole was "located in" the boundaries of the recreation area. *See Daniel*, ¶ 30 (concluding the parking lot was "located in" the recreation area because it was located on the public entity's property and adjacent to the public recreation area).[2]

¶ 31    Therefore, we affirm the district court's finding that the area where the child fell was located within a recreation area, albeit on slightly different grounds than relied on by the court. *Stickle v. County of Jefferson*, 2022 COA 79, ¶ 41, *aff'd*, 2024 CO 7.

### E.    The Fencepost Hole was a Dangerous Condition

¶ 32    Prospect contends that the fencepost hole was not a dangerous condition. We disagree and conclude that there was record support for the district court's finding that the fencepost hole was a dangerous condition that existed for such time that, had Prospect exercised reasonable care, it would have been discovered.

---

[2] Prospect's reference to the Van Bibber Trail to argue that the horse path and fencepost were within that area appears irrelevant, as the record contains no precise location of the trail.

¶ 33    The CGIA defines a "dangerous condition" as

> either a *physical condition* of a facility or the use thereof that constitutes an *unreasonable risk* to the health or safety of the public, which is known to exist or which in the exercise of reasonable care *should have been known* to exist and which condition is proximately caused by the negligent act or omission of the public entity or public employee in constructing or maintaining such facility.  For the purposes of this subsection (1.3), a dangerous condition *should have been known to exist* if it is established that the condition had existed for such a period and was of such a nature that, in the exercise of reasonable care, such condition and its dangerous character should have been discovered.

§ 24-10-103(1.3), C.R.S. 2024 (emphasis added).

¶ 34    "Colorado courts have consistently held that the phrase 'knew or should have known' is satisfied by actual or constructive knowledge, also referred to as the knowledge that one exercising reasonable diligence should have."  *Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 571 (Colo. 2008).  And "the plaintiff must prove that the [hole] created a chance of injury . . . which exceeded the bounds of reason."  *City & Cnty. of Denver v. Dennis*, 2018 CO 37, ¶ 23.  "Assessing whether the plaintiff has met this burden requires examining the totality of the circumstances presented by

18

the undisputed evidence as to whether that particular condition presented an unreasonable risk." *Maphis v. City of Boulder*, 2022 CO 10, ¶ 22. The existence of a dangerous condition is a question of fact, and we defer to the district court's factual findings unless they are clearly erroneous. *McKinley v. City of Glenwood Springs*, 2015 COA 126, ¶ 12.[3]

¶ 35    To determine whether a dangerous condition exists for purposes of the CGIA, we employ a four-part test. A public entity waives immunity if the injuries occurred as a result of

1. the physical condition of the public facility or the use thereof;

2. which constitutes an unreasonable risk to the health or safety of the public;

3. which is known to exist or should have been known to exist in the exercise of reasonable care; and

---

[3] We disagree with Prospect that whether a defendant had actual or constructive knowledge of a "dangerous condition" is reviewed de novo. *See Jefferson County v. Dozier*, 2025 CO 36, ¶ 36 (determining that a district court's finding of when a public entity learns of the dangerous condition is reviewed under the clear error standard).

4. which condition is "proximately caused by the negligent act or omission of the public entity in constructing or maintaining the facility."

*St. Vrain Valley Sch. Dist. RE-1J v. Loveland*, 2017 CO 54, ¶ 16 (*St. Vrain II*).

¶ 36    First, we have already determined that the horse pathway is a "public facility" and neither party disputes that the hole was a physical condition.  But Prospect appears to dispute whether the hole was actually a fencepost hole from the fence Prospect employees removed in September or October 2020.  There was ample evidence to support the district court's conclusion that it was, including photographs and testimony from a park visitor who said it was "obvious[ly]" a posthole located "sort of right along where that fence line would have been."  The district court compared Sherrill's testimony with Exhibit 4, a photograph taken of the location of the injury by Sherrill, and found it was consistent with the picture.

¶ 37    Second, we conclude that there was evidence to support the district court's finding that the fencepost hole posed a risk to the health and safety of the public that a reasonable person could

20

conclude exceeded the bounds of reason.  Sherrill described the hole as five to six inches in diameter, and said that it appeared to be made by an auger and perfectly round; that it appeared to be manmade.  Sherrill also testified that he estimated the hole to be approximately four inches deep, although there was additional testimony that it may have been as much as ten inches.  Brad Sassolino, a Prospect maintenance technician and the supervisor of the Prospect Arena's fence removal, testified that the fencepost holes were "a safety hazard" that could result in injury because the holes were "a trip hazard."  *See McKinley*, ¶ 13 (depression in parking lot that was approximately four inches deep was a dangerous condition).  The district court found that Prospect's "employees allegedly failed to fully fill, or improperly filled, at least one fencepost hole.  Its employees created a dangerous condition."  Whether a condition on a public facility "presents an unreasonable risk will necessarily be a fact-specific inquiry," and we will defer to the district court's factual findings if they are supported by the record.  *Dennis*, ¶ 23.  Given this evidence, we agree with the district court that the hole presented an unreasonable risk to the public.

21

¶ 38    Prospect further contends that the fencepost hole, by itself, did not create an unreasonable risk, as it was the child's actions that contributed to the injury. Specifically, Prospect argues that the child "was injured because he ran at [an] unknown animal, [and] ignored warnings from its owner," and the "way in which [the child] approached the horses" was unreasonable. In essence, Prospect states that the child's injuries did not result from the fencepost hole. We disagree.

¶ 39    But the proper analysis is whether a dangerous condition is proximately caused by the negligent act or omission of the public entity in constructing or maintaining the facility. *Dozier*, ¶ 32; *see also St. Vrain II,* ¶ 16. Thus, whether the child's injuries were proximately caused by his own negligence is irrelevant to determine whether Prospect waived immunity. *Daniel,* ¶ 27 ("[A]n *injured individual's* purpose in visiting the recreation area where he or she was injured is irrelevant. . . . [A] public entity owes the same duty to an individual injured by a dangerous condition 'located in' a 'recreation area' regardless of the idiosyncratic reasons why that individual might have visited the recreation area.").

22

¶ 40    Third, the fencepost hole existed for such a time that the exercise of reasonable care should have led to its discovery. The fence was removed in September or October of 2020. The child was injured on November 21, 2020. Between when the fenceposts were removed and the date of the injury, Prospect employees visited Prospect Arena multiple times for routine inspections and trash cleanup. And based off these routine inspections, Prospect argues that its employees did inspect its work. But Prospect's employees did not visit the park to specifically inspect for fencepost holes until after the child was injured. And photographs of the hole taken after the child's injury reveal that the hole would have been reasonably visible if Prospect employees inspected that area.

¶ 41    Thus, had Prospect exercised reasonable care and inspected its work removing the fence, it should have discovered the fencepost hole.

¶ 42    Prospect further argues that there was no evidence that the fencepost hole existed before the date of the child's injury and that there was testimony offered by a park visitor that she did not notice any holes in September and October of 2020. Additionally, Prospect alleges testimony during the *Trinity* hearing indicated that

the fencepost hole "rapidly deteriorated or settled, creating a condition [that Prospect] lacked any opportunity to discover." As we have already stated above, however, the existence of a dangerous condition is a factual question, and we defer to the district court's factual findings. *McKinley*, ¶ 12. And the district court found, "Ultimately, there was a fencepost hole that [the child] tripped on from fencing [Prospect] recently removed. And [Prospect] should have known of the dangerous condition it created had it inspected its work." While the record may not contain an exact date of when the hole was created, we are not in a position to second-guess the district court's findings that it existed for such a time that it should have been discovered upon reasonable inspection.

¶ 43     Finally, because we determine that Prospect created the hole by removing the fence in 2020, Prospect's negligence by not

ensuring all the fencepost holes were properly filled proximately caused the hole.[4]

## III.   Attorney Fees and Costs

¶ 44     Prospect requests its attorney fees and costs pursuant to C.A.R. 28(a)(9), C.R.C.P. 12(b), and sections 13-16-113 and 13-17-201, C.R.S. 2024.  Because we affirm the district court's order, we decline to award Prospect its attorney fees.

## IV.   Conclusion

¶ 45     We affirm the district court's order.

JUDGE WELLING and JUDGE GROVE concur.

---

[4] This case is not like the timing at issue in *Dozier*, ¶¶ 3, 27.  There, the supreme court determined that immunity had not been waived because "the County wasn't afforded 'a reasonable time under the circumstances to discover and correct the condition'" because it was just minutes between when water spilled on the courthouse floor and the plaintiff slipping on the puddle.  *Id.* at ¶¶ 5, 27 (quoting *Safeway Stores, Inc. v. Smith*, 658 P.2d 255, 257 (Colo. 1983)).  In this case, the district court determined, with record support, that the fencepost hole existed for two to three months before the child's fall, so the dangerous condition existed for a sufficient amount of time that Prospect should have known about the condition and fixed it.